FAHY v. SOCIETY FOR REFORMATION OF JUVENILE DELINQUENTS.

(District Court, S. D. New York. March 8, 1902.)

WHARVES—INJURY TO VESSEL—EVIDENCE CONSIDERED.

    Evidence considered, and *held* not to sustain the claim that an injury to the bottom of libelant's barge was received through the defective condition of the bottom of the river at defendant's wharf, but to show that it was due to a previous grounding of the barge on some rocks.

In Admiralty. Suit for injury of vessel at wharf.

Hyland & Zabriskie, for libelant.
Miller, Decker & Miller, for respondent.

ADAMS, District Judge. The libelant's barge Maggie Eck was injured by striking the bottom at or near the premises occupied and used by the defendant corporation as a house of refuge on Randall's Island, East river, on or about the 4th day of March, 1901. The barge was loaded with about 330 tons of pea coal, which she had taken on board at Hoboken, and had contracted to deliver to the house of refuge. The usual place of delivery was at a wharf maintained by the respondent on the Harlem river side of the island, and it was at such wharf that the libelant claims the injuries were received, through a defective condition of the bottom of the river at or near the wharf, which the respondent negligently permitted to exist, so that when the barge went there in the due pursuit of her business, and upon the invitation of the respondent, she received the injuries without any fault on her part. The respondent contends that the barge received injuries to her bottom by grounding on rocks through being towed out of the channel to reach another wharf on the island, not in any manner

controlled by the respondent, mistakenly supposed by the tug towing her to be the wharf to which she was bound, and that it was through such injuries that the bark sunk at the wharf in question, where there was plenty of water to have floated her if she had not sunk from her previous injuries.

The facts appear to be that the tug first attempted to take the barge to a wharf known as the "North Dock," opposite 125th street, some distance from the one where she was bound, and, in doing so, ran her upon some rocks. She took the ground about 5:30 p. m., and the tug left her there while she delivered another barge in the vicinity, when she came back and dragged the barge off after she had remained fast for probably an hour, and took her to the respondent's wharf. Difficulty in determining the proximate cause of the sinking arises from the absence of reliable evidence as to the time the barge began to leak, or took the bottom at the respondent's wharf. The latter is said to have been 2 o'clock in the morning of the 5th, but that is altogether dependent upon the statements of the master of the barge, whose testimony was not very satisfactory. He said that the barge drew, as she was loaded, 5 or 5½ feet of water. If such were the case, it is clear that the injuries which caused the sinking could not have been received at the place of sinking, because the testimony is convincing that there was a greater depth of water there at all stages of the tide. It is urged by the libelant that the master was mistaken, and that the draft was much greater. I think it was, but the error militates against the master's reliability, and the libelant is dependent altogether on his testimony for an account of what took place after the barge was taken to the lower wharf, excepting that one of the respondent's witnesses saw the boat there about 10 o'clock, with nothing, apparently, the matter with her then. The master says that, when the barge was first taken to the wharf, there was another boat lying there, and his barge lay alongside of her until she was removed, about 11 o'clock, when the Eck was pulled to within about 4 feet of the face of the wharf, and made fast. The master's first testimony in this connection was:

"Q. What did you do after eleven o'clock, when you made your boat fast? A. I measured her, and there was no water into her. Q. What time was it when you measured her? A. I guess it was about eleven o'clock, after I got through at the dock. Q. Then what did you do? A. Then I went down in the cabin, and sat there and read the paper for a while. Q. Until what time? A. Until about twelve. Q. What did you do then? A. Came out and measured it again. The tide had lowered a little bit, and I slacked the lines off a little bit. Q. Did you find any water at twelve o'clock? A. Yes, sir. Q. How much did you slacken the lines then? Ans. A couple of feet, to get her away from the dock if the tide lowered. Q. Was the tide lowering at that time? A. Yes, sir. Q. Then what did you do? A. Went back in the cabin, and then went to bed. Q. What time was it when you went to bed? A. About half past twelve. Q. What next attracted your attention? A. I got up about two o'clock, and found she was aground."

Upon being recalled by the libelant at the end of the case, he testified:

"Q. When did you next sound your pumps after you were hauled off this place opposite 125th street? A. When I got made fast to the dock; about 10 or 15 minutes. Q. Did you find any water? A. No, sir. Q. When next

did you sound? A. After I got to the dock; lying next to the barge. Q. Find any water then? A. No, sir. Q. I thought you said you sounded up to twelve o'clock at night? A. Yes, sir; I sounded twice after that. Q. Find any water in her? A. No, sir."

There is some variation of the statements of the witnesses as to the hour of high tide, but I gather from the testimony and the standard tide tables that it was high water at Hell Gate about 9:15 o'clock, and there could have been little difference at this place. If the barge was leaking at 12 o'clock, it is not probable that it could have been caused by anything that happened at the lower wharf, but apparently was the result of the first injuries. This view is sustained by the nature of a wound on the bottom of the boat, which was described as having been "chewed up," apparently by sharp rocks. There is evidence on the part of the libelant tending to show that there was a spile somewhat outside of the face of the wharf, and projecting a foot or a foot and a half above the bottom of the river, upon which the inward bilge of the barge rested when she was sunk, and that there was a collection of ashes near the face of the dock, upon which the barge also rested when sunk, giving her a strong outward list, but nothing appears which so satisfactorily accounts for the wound as the fact of the bottom of the barge having been in contact with sharp rocks when pulled off by the tug. If the wound existed when the barge was taken to the lower wharf, and at 12 o'clock she had leaked so much, after the intervening hours of natural absorption of the incoming water by the fine coal of which the cargo was formed, that the leakage was evident to the not very vigilant master, it is obvious, the barge then being afloat, that the proximate cause of the disaster was the first grounding, in connection with the master's neglect to pump when he found she needed it. The testimony with respect to the bottom of the river at the lower wharf is in irreconcilable conflict. On the libelant's part, witnesses have testified that at low tide there were not more than 4½ feet at some places where the barge lay sunk, and on the respondent's part it is shown by a careful survey made by the official hydrographer for the department of docks, shortly after the accident, and while the bottom was in the same condition, that there were 8 to 10 feet of water close to the face of the wharf at low water, clear of obstructions, with increasing depths towards the center of the river. The respondent's contention in this respect is sustained by credible testimony that the wharf had been used in the existing condition of the bottom at all stages of the tide for many years, both by vessels of the character of the libelant's and other vessels of greater drafts, without injury of any kind or suggestion of danger.

A review of the whole testimony confirms my impression on the trial that the libelant's allegations of negligence could not be sustained.

Decree dismissing libel.